United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK WILLIAM CAPPELLO,

      Petitioner,

      v.

BRIAN D. PHILLIPS, Warden,

      Respondent.

No.  C 20-08287 WHA

**ORDER DENYING PETITIONER'S AMENDED HABEAS PETITION**

## INTRODUCTION

Petitioner Mark Cappello, a California prisoner, filed this *pro se* writ for habeas corpus pursuant to 28 U.S.C. § 2254, which he subsequently amended.  Respondent was ordered to show cause why the petition should not be granted (Dkt. No. 10).  Respondent filed an answer and petitioner thereafter retained counsel.  No traverse was filed.  For the following reasons, the amended petition is **DENIED**.

## STATEMENT

### A. FACTUAL BACKGROUND

In early February 2013, a triple homicide took place in a family cabin located in Forestville, California.  The three victims were discovered sprawled on the ground, each with a single gunshot wound to the skull.  They were identified as Richard Lewin (a New York stockbroker), Raleigh Butler (a Colorado ski instructor), and Todd Klarkowski (an

United States District Court
Northern District of California

1    acquaintance of Lewin).  All men had in common a side-job of distributing marijuana.

2    Petitioner Mark Cappello was eventually identified as the shooter.

3         Petitioner Cappello was a marijuana transporter from Colorado who worked for a drug

4    dealer named Jeffrey Dings.  He transported large amounts of cash and drugs for Dings from

5    East to West coast, usually being paid by the pound.  Cappello had a special "enzyme" which

6    he sprayed on packaged marijuana that would neutralize its odor, thereby avoiding detection.

7    Cappello's relationship with Dings, however, began to sour.  Dings started being late on

8    payments and, eventually, stopped paying Cappello's fees all together.  After a few

9    unreimbursed trips, Cappello grew frustrated and fell on financially hard times.

10        In late January 2013, Cappello turned to a different source for income.  He was hired by

11   Victim Klarkowski to be a part of a drug transportation deal.  Victims Klarkowski, Butler, and

12   Lewin planned to import marijuana from California to New York for sale and heard of

13   Cappello's "pro" driving skills through the grapevine.  Cappello accepted the job.  He offered

14   his ex-day laborer Odin Dwyer $10,000 to assist him with the transport and to act as a "scout."

15   Odin agreed, and enlisted the help of his father, Francis Dwyer.

16        In early February, Cappello headed west from Colorado in his white Ford Bronco,

17   accompanied by his dog, Duke.  The Dwyers followed suit, departing in their Ford Ranger.

18   They arrived in Santa Rosa the next day and checked into hotels.  Later that day, Cappello met

19   the three victims who had also flown into San Francisco to discuss details of the job.  They had

20   all convened at a bar and spoke for over an hour.  Surveillance video confirmed that Cappello

21   took this meeting with the three alone — the Dwyers were not present.

22        The next day, Cappello waited on a call from the victims to meet at the cabin.  When the

23   call came in, Cappello and Odin left in Cappello's Bronco, and Francis remained behind.

24   Upon arrival at the cabin, which was owned by Victim Butler's family, Cappello instructed

25   Odin to pretend another person named "Vic" was surveilling the area and to make periodic

26   fake calls.  Previously, Cappello had explained to Odin that he was paid based on how many

27   people were in his crew, and the appearance of an additional person keeping watch outside

28   would boost Cappello's payday.  Odin complied.  In the cabin, Victims Klarklowski, Butler,

and Lewin spoke to Cappello about the process of resealing the marijuana in airtight bags and spraying them with Cappello's famous "enzyme." Cappello instructed the three to remove the batteries from their cellphones so as not to interfere with "Vic's" surveillance equipment outside. They complied. The three moved the marijuana to a back room and wore latex gloves to complete the job. Cappello supervised while everyone packaged.

When Odin left to a different room in the cabin to make a third fake call to "Vic," he heard three quick successive pops. He peered down the hallway and saw Cappello with his arm extended, a gun in-hand. The three victims were dead. Odin asked, "What did you do that for?" Cappello responded, "It was something that had to be done." Cappello then instructed Odin to search for a bullet casing he could not locate and to load the marijuana into the truck. Cappello specified that they should leave some marijuana behind "so it would look like a drug deal gone bad." When Cappello returned to the hotel, he showered, shaved his beard, and changed his clothes. He put the marijuana in Francis' Ford Ranger. Upon leaving the area, Cappello instructed the Dwyers to dispose of his clothes, his gun, and other evidence containing his DNA on the road. They complied.

When the group returned to Colorado, Cappello informed the Dwyers they should each sell the marijuana, and he expected $90,000 from the profits they would make. Cappello then went to his girlfriend Janice Rodgers' home. There, he seemed nervous and "stayed up washing money" all night in hot soapy water. Within two days, he told her he would be going to Brazil for a while (where he had another girlfriend and child) and would contact her later.

Cappello was arrested a few days later in Mobile, Alabama. He had in his possession three passports and a Brazilian driver's license, among other things. The Dwyers were arrested shortly thereafter. They both were found with pounds of marijuana and thousands of dollars in their possession. Eventually, the Dwyers turned and testified against Cappello.

### B. PROCEDURAL BACKGROUND

Petitioner was ultimately convicted by a jury in Sonoma County of three counts of special-circumstance murder, one count of first-degree burglary, one count of first-degree residential robbery, and one count of conspiracy to possess marijuana for sale and transport.

United States District Court
Northern District of California

1    Petitioner appealed his convictions, all of which were affirmed by the California Court of

2    Appeal save for a remanded issue on four firearm enhancements.  *See People v. Cappello*,

3    2019 WL 2082963 (Not Reported).  The firearm enhancements were confirmed by the trial

4    court, and the California Supreme Court summarily denied review.

5        In June 2022, petitioner filed his first amended habeas petition *pro se*.[1]  Respondent was

6    granted one sixty-day and one thirty-day extension to submit an answer, which was filed on

7    December 22, 2022.  Petitioner had "30 days of his receipt of the answer" to file a traverse

8    (Dkt. No. 36, 38).  Petitioner stated he received the answer in custody on January 4, 2023, thus,

9    he had until February 4, 2023, to file a traverse.

10        Petitioner requested three separate extensions of time to file his traverse due to various

11   issues, including the complexity of the case, health emergencies, and an undelivered trial

12   transcript (Dkt. Nos. 52, 54, 57).  Each extension request was granted to accommodate

13   petitioner.  By the third extension, the due date was pushed back nearly four months to June 1,

14   2023, with the warning that "[n]o further extensions of time will be allowed" (Dkt. No. 58).

15        On May 30, 2023, two days before the traverse deadline, petitioner again moved for an

16   extension, this time accompanied by a declaration from newly retained habeas counsel.

17   Attorney Tony Farmani declared he was retained by petitioner on May 23, 2023, and due to

18   upcoming travel and limited computer access, a sixty-day extension to file the traverse was

19   needed.  Due to this new representation, the Court saw it fit to grant a "final extension of time"

20   for the traverse to July 31, 2023 (Dkt. No. 60, 61).

21        On July 29, 2023, two days before the traverse was due, petitioner requested another

22   extension, this time for 120 days, until November 28, 2023.  The motion was accompanied by

23   another declaration from Attorney Farmani stating he "woefully underestimated the amount of

24   time that was going to be required to complete the traverse."  Due to its own staffing restraints,

25   the Court could not accommodate such a long extension, but granted the request in part by

26

27   ───────────────

28   [1] Before this amended petition, the case had been stayed on the grounds the initial petition
     contained several unexhausted claims and one procedurally defaulted claim  (Dkt. No. 13).  The
     stay was lifted upon filing of the amended petition, after petitioner went back and exhausted his
     claims and respondent was ordered to file a response.

giving the petitioner an extra 63 days, until October 2, 2023, to file the traverse (Dkt. Nos. 62, 63).

Finally, on October 1, 2023, one day before the traverse deadline, petitioner filed yet another request for extension. This time requesting an additional 57 days to November 28, 2023, Attorney Farmani declared that the additional time was needed to obtain court records that were "taking longer than anticipated . . . due to the age of the case." Unfortunately, the Court could not accommodate any further extensions, as the law clerk staffed on the case was nearing the end of her term. An order denying the extension request was filed and petitioner was advised he had "until Friday, October 6, 2023, at noon the latest to file his traverse. If one is not submitted by that time, the petition will be decided on the papers already submitted" (Dkt. No. 65).

Instead of filing a traverse, petitioner filed a "motion for leave to file supplemental petition for writ of habeas corpus," with a supplemental petition attached along with over 350 pages of previously unprovided records. The supplemental petition raised a new, unexhausted *Brady* claim that counsel argued merited an evidentiary hearing, or, in the alternative, a stay to exhaust in state court. An opposition, reply, and response to reply as to this supplemental petition was filed (Dkt. Nos. 66, 67, 69, 70). This order denies any further delay to return to state court and will dispose of all issues.

**ANALYSIS**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Further, under the 'unreasonable application' clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). A federal habeas court may not, however, issue the writ "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Thus, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409, 411. When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the federal habeas court looks to the last reasoned opinion from the state courts. *See Wilson v. Sellers*, —— U.S. ——, 138 S. Ct. 1188, 1192, 200 L.Ed.2d 530 (2018).

**1.  ALLEGED INSUFFICIENT EVIDENCE TO SUSTAIN PETITIONER'S CONVICTION.**

In ground fourteen, petitioner argues that the evidence presented during trial was insufficient to support a conviction beyond a reasonable doubt. Specifically, he maintains no rational trier of fact could have found him guilty because there was "a complete lack of proof" on the essential elements of the crime, given that there were no fingerprints, no DNA evidence, no blood, and inconclusive results on the murder weapon (Br. 81). Respondent counters that there was overwhelming evidence of petitioner's guilt, and the jury's finding should not be overturned here.

The Due Process Clause protects a criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When applying this constitutional

standard to a conviction obtained in state court, a federal court must assess the historical facts
to determine the sufficiency of the evidence.  To this end, the critical inquiry "does not require
a court to ask itself whether *it* believes the evidence at trial established guilt," but rather
"whether, after viewing the evidence in the light most favorable to the prosecution, any rational
trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
*Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (cleaned up).

A rational trier of fact could have easily found proof of guilt beyond a reasonable doubt
given the trial record here.  Numerous examples of circumstantial and direct evidence existed
that showed petitioner killed the victims and that one or more of the special circumstances
applied.  A non-exhaustive list of examples of such evidence is now summarized:

  *(1)  Evidence that Identified Petitioner as the Shooter.*

A rational trier of fact could have concluded that petitioner was the shooter.  The
evidence showed that the murder weapon was a .45 caliber handgun, that petitioner owned a
.45 caliber handgun, that petitioner's gun was found disassembled and discarded in a creek
near the murder scene, and that petitioner's gun generally matched the same casing and bullet
jackets found on-scene.  Specifically, witness Steven Wanko testified that he purchased a
Springfield .45 caliber semi-automatic handgun in July 2008 and sold it to petitioner in 2009
for roughly $550 (17 RT 2884–86).  Criminalist Samantha Evans also testified that based on
the rifling impressions on the three fired bullet jackets retrieved on-scene, and the single bullet
casing also found on-scene, she determined the bullets were fired by a .45 caliber firearm (17
RT 2940).  She further concluded that the one bullet could have come from petitioner's firearm
or another firearm with similar "class characteristics"  (17 RT 2918–19, 2930).  Although
petitioner argues these results were "inconclusive" as to whether the bullets definitely came
from his particular gun, this evidence was still probative to support a finding that his gun was
used given the other evidence at play.

Evidence also supported a finding that petitioner shot the victims and instructed Odin to
discard the firearm.  Odin was the sole eyewitness to the murder.  Odin testified that petitioner
shot the victims while Odin was making a fake call — at the direction of petitioner — in the

1   other room.  Petitioner then instructed Odin to look for one of the missing casings, take some

2   marijuana, and leave some behind so that it can look like "a drug deal gone bad" (29 RT 5094,

3   5098–99).  Odin testified that, upon return to the motel, petitioner instructed the Dwyers to

4   discard his gun and his other personal items that had petitioner's DNA on it, and they

5   complied.  The Dwyers later led the authorities to the exact locations where these things were

6   hidden which corroborated their testimony.

7        Petitioner critiques that Odin lied during his trial testimony and there was no physical

8   evidence linking him to the scene of the crime.  Such evidence, however, is not needed to

9   sustain a conviction beyond a reasonable doubt.  The jury was free to evaluate the evidence,

10  believe Odin's testimony, and draw conclusions in favor of the prosecution using the

11  circumstantial evidence.  Although petitioner tried to argue that Odin was the true gunman, the

12  jury reasonably rejected his theory of the case in light of the countervailing evidence showing

13  otherwise.

14        *(2)      Evidence that Petitioner Satisfied the Special Circumstance.*

15        A rational trier of fact could have concluded that the special circumstance enhancement

16  applied here.  The prosecution argued that there were five special circumstances relevant to

17  this case: robbery, financial gain, lying in wait, burglary, and multiple victims (35 RT 6125).

18  Each one could have been found here.  There were three victims in this case, satisfying the

19  multiple victims point.  Pre-meditation was shown through Odin's testimony that Cappello

20  asked him to buy rubbing alcohol which he used to disassemble and clean his handgun before

21  they headed to the cabin.  This was corroborated by a Target receipt (14 RT 2387–90).  A jury

22  could have reasonably concluded that this showed petitioner's intent to kill and steal upon

23  arrival to the cabin.  Odin also testified that before they entered the cabin, Cappello instructed

24  him that he should make several fake calls to a fictitious person named "Vic" during the

25  operation.  Upon entering the cabin, petitioner then told the victims to remove the batteries

26  from their cellphones so as not to interfere with "Vic's" electronic surveillance, which was

27  allegedly occurring outside (29 RT 5083–89).  A jury could have reasonably concluded the

28

United States District Court
Northern District of California

purpose of this ruse was to ensure the victims were isolated and without any manner to contact others in preparation for the impending murder-robbery.

Furthermore, testimony from Odin and other circumstantial evidence could have reasonably allowed a rational juror to conclude petitioner stole and hid "deal money" for his own financial gain.  Odin testified that petitioner had the deal money in this case all along in his truck yet lied about it to the victims.  The deal money, Odin testified, was the money raised by the victims and intended for use to purchase the marijuana from a third-party grower. Petitioner was tasked with bringing this money along to California to effectuate the sale (29 RT 5086–87):

> Q:  "[At the cabin,] Was there any discussion about any missing money?
>
> A:  Yeah. Sounded like — they were all discussing some money that is seemed like Mr. Cappello still had to bring to the table.  He said that he had some money back in the motel room, and he could go on and get that real quick.
>
> Q:  So you heard a conversation between Defendant Cappello and one of the other men about money?
>
> A:  That's correct.
>
> Q:  Do you remember how much money it was that they were discussing?
>
> A:  I heard 40 something thousand.
>
> Q:  Is that the 40 something thousand that Defendant Cappello said he could go back to the motel and pick up?
>
> A:  That's correct.
>
> Q:  Did you see any money there at the cottage that day?
>
> A:  I never saw any money at the cottage.  And I thought it was weird Mr. Cappello said he had to go back to the hotel to pick up money because I was under the impression on the whole trip he kept his money in the lock box, [sic] tool box right behind the seat of his truck.
>
> Q:  Why were you thinking that?
>
> A:  Because the whole trip Mr. Cappello implied that he was bringing $275,000 with him . . . Mr. Cappello always said he was collecting receipts which was his terminology for collecting money from people to make his next trip happen, that everybody was sort of

> pulling together to make this work.  So he had said when we left Colorado that he had the money right in the lock box in his truck.  So I couldn't figure out why he would have left it at the hotel given that we were going there for the deal.

A search of petitioner's vehicle revealed a toolbox bolted to the floorboard behind his front seats (20 RT 3366).  Petitioner's girlfriend Rogers also testified that upon his return, petitioner stayed at her place and washed money in soapy hot water all night.  She said petitioner stated that the bills might have "Heffy's" (aka Victim Klarkowski's) fingerprints on them (26 RT 4504–08).  She also testified petitioner said he had about $100,000 and he put the money in a cereal box.  A couple of days later, he took the money to his brother's ranch and came back without it (26 RT 4505–08, 4512, 4549).  This stolen deal money was never retrieved.

Although the evidence is unclear as to the total amount of money petitioner had or where he ultimately hid it, this testimony taken together was sufficient to show beyond a reasonable doubt that petitioner stole and hid a substantial amount of money originally intended to purchase the marijuana for his own personal financial gain.  Separately, petitioner instructed the Dwyers to sell the stolen marijuana and give him $90,000 of the proceeds, further evidencing an intent to have personal monetary gain as a result of this crime.  A jury was free to draw these conclusions given the evidence presented.

A rational trier of fact could have found the critical elements of special circumstances murder were proven at trial.  Even a non-exhaustive review of the evidence against petitioner shows the conviction was supported beyond a reasonable doubt.  Indeed, upon the end of the two-month trial, the jury found petitioner guilty after only one day of deliberating.  This order will not disturb the jury's valid finding of guilt.  This ground is **DENIED**.

### 2. ALLEGED ERROR OF AUDIO RECORDINGS ADMITTED DURING TRIAL OF COOPERATING WITNESSES.

In ground one, petitioner claims that the trial court violated his constitutional right to a fair trial and to confront his witnesses by admitting certain audio recordings of the Dwyers' interviews with law enforcement during trial to show their prior consistent statements.  Petitioner provides no supporting facts for this claim.  Instead, he references only "issues raised in the attached petition for review.  Appellants opening brief p.g. 52, 60, and the

10

arguments of supporting facts set forth their within" (Br. 8).  Respondent opposes, stating petitioner did not adequately exhaust this claim, and, in any case, it is meritless given the Dwyers were present in-person and subject to cross examination.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  Thus, it is not enough for petitioner to point to an alleged erroneous application of state evidentiary rules, but he must explain *why* the ruling in question violated his federal due process rights.  Here, petitioner references his same state law arguments and asserts without support that those rulings are also violative of federal due process.  In particular, he cites his opening brief which stated the Dwyers' interview recordings were "inadmissible" because they were "not specifically consistent with either man's testimony, were hearsay, or were simply speculative" (Resp. Exh. 3 at 60).  In this regard, the California Court of Appeal held that "admitting the entire interviews without considering which portions were relevant to rehabilitate credibility" was error, but "the additional details . . . added nothing that was prejudicial to Cappello."  *See* 2019 WL 2082963 at *11.  Petitioner does not state any further argument as to why or how this evidence violated his federal due process rights.  There being no evident federal due process violation alleged, this claim fails.

Similarly, there is no Confrontation Clause violation.  "When a declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.  So long as the declarant is present at trial to defend or explain it, the Confrontation Clause does not bar its admission." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).  The Dwyers were both present in-person during petitioner's trial and subject to cross-examination both before and after the admission of the recorded interviews in question.  Petitioner's ground one is DENIED.

### 3. ALLEGED IMPROPER VOUCHING BY DETECTIVE BRANDON CUTTING.

In grounds two and three, petitioner asserts his due process and confrontation rights were violated during trial because the lead detective on the case, Detective Brandon Cutting, improperly vouched for the credibility of the Dwyers during his testimony. Petitioner provides no supporting facts but, again, simply references his opening state appeals brief (Br. 8). Further, he states his trial attorney failed to object to the impermissible vouching, and thus provided ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

As explained above, it is insufficient for petitioner to merely cite to his opening state court appeals brief, with no elaboration, to show a federal violation occurred that merits habeas relief. Regardless, even if this order refers to his opening appeals brief, no federal violation is evident, as only state law violations were alleged. Petitioner argued vouching occurred in violation of state evidentiary rules because Detective Cutting repeatedly confirmed that he found corroborating evidence tending to show the Dwyers' account of events were true. The California Court of Appeal reviewed the complained-of testimony and reasoned the claim was forfeited because trial counsel did not object, and, in any case, no vouching occurred because "defense counsel opened the door to the prosecution's questions about the reasons [Detective] Cutting found the Dwyers credible." 2019 WL 2082963 at *16. The state decision further held "[b]ecause [Detective] Cutting's cross-examination testimony was harmless, Cappello's claim for ineffective assistance of counsel . . . also fails."

Petitioner does not explain how this evidentiary holding violates any clearly established Supreme Court decision. The federal habeas writ is unavailable for violations of state law, and the California Court of Appeal's interpretation of California law binds the federal court on habeas review. *See Hicks v. Feiock,* 485 U.S. 624, 629 (1988). This claim fails.

### 4. ALLEGED IMPROPER CHARACTER EVIDENCE.

In ground four, petitioner contends the trial court admitted improper character evidence and thereby violated his due process right to a fair trial. In particular, he argues it was error to admit testimony regarding: (1) his alleged association with the Hells Angels gang, (2) his

12

possession of various weapons and past specialized military training, (3) his involvement in the drug trade beyond simple transporting, and (4) instances when he behaved "boorishly" in the past. He also objects to the admission of his Brazilian daughter's and girlfriend's government documents as completely irrelevant and prejudicial (Br. 9–10).

The California Court of Appeal decision addressed each basis and found no error existed for the majority of them. In instances where error might have existed due to lack of relevance, the decision reasoned the error was nevertheless harmless. *See* 2019 WL 2082963 at *17–24. On habeas review, the analysis does not seek to fine-tune these state evidentiary rulings, but rather the question is whether the admission of evidence so infected the entire trial that the resulting conviction violates federal due process. This order holds that it did not.

*First*, petitioner's girlfriend, Jennifer Rodgers, testified that she believed petitioner was a member of the Hells Angels gang and the Italian Mafia based on things petitioner told her in the past and photos he had shown her. The Court of Appeal decision held that it was not error to admit such testimony because it "was admissible as relevant to explain [Rogers'] fear [of petitioner] and support her credibility." *Ibid*. Petitioner now argues such testimony was a violation of due process too, because gang membership had nothing to do with the prosecution's theory of the case and it created a risk that the jury improperly inferred he was of criminal disposition (Br. 11–13)[2].

This ruling was not a violation of due process. As the California Court of Appeal reasoned, the testimony in question was not admitted to show petitioner's propensity for violence, but rather to explain Rodgers' fearful state of mind and why she would have lied to the police initially. The jury was specifically instructed not to use her testimony as proof that petitioner was in fact a part of the Hells Angels or the mafia, and to only use it in order to evaluate Rodgers' conduct and state of mind. This limiting instruction protected against the very danger petitioner now claims infected the trial. This basis is denied.

---

[2] Petitioner makes further arguments against this admission, namely that he is in fact not a member of Hell's Angels and that his tattoos have "full biblical meaning." These testimony-like assertions cannot be considered here.

1

2

3

4

5

6

7

8

9

10

11

United States District Court

Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Second*, the trial judge allowed evidence of various weapons and paraphernalia found at petitioner's house.  These items included a hunting knife, a bag containing AR 15 accessories, a loaded shotgun, rifles, various ammunition and magazines, a silencer, and a DVD on "Advanced Pistol Handling."  The trial judge also allowed the Dwyers and other witnesses to testify about instances when petitioner would talk to them about his military training and instances when he showed them his weapons.  Petitioner argues admitting this evidence was prejudicial because "none of the weapons had anything to do with the crime."  He states the weapons were all "legally purchased" in Colorado and had never even been in California physically until the trial (Br. 16).  The Court of Appeal decision held the trial court did not abuse its discretion in allowing this evidence because it "was not admitted to show Cappello had a propensity to carry weapons."  Instead, the testimony was relevant to show the power dynamic between Cappello and the Dwyers and to explain why they would have obeyed what Cappello instructed them to do after the shootings.  Additionally, it tended to show petitioner had a wide range of shooting experience and was "more likely to belong to th[e] small category of people" skilled enough to shoot the victims in the manner they were shot on-scene.  2019 WL 2082963 at *21.  Given that the appeals decision shows this evidence had useful purposes other than the inadmissible propensity argument about which petitioner complains, it was not a violation of due process to admit it.

*Third*, petitioner argues it was improper character evidence to introduce that he "was involved in the drug trade of sales beyond transporting marijuana only" (Br. 10).  Petitioner provides no argument or analysis in relation to this point.  Regardless, even if petitioner did elaborate, the Court of Appeal decision adequately addressed and denied what presumably would have been the same issue he attempts to raise here.  The decision reasoned evidence that petitioner sold prescription pills and other illegal drugs was not so inflammatory as compared to the violent crime with which he was charged.  It further reasoned everyone involved in the case was also involved in the illegal drug trade, so this evidence was unlikely to invoke an emotional bias specific to petitioner.  *Id*. at *22.  This holding was not objectively unreasonable and will not be disturbed.

*Fourth*, petitioner argues it was prosecutorial misconduct to call him "boorish" and to paint him as a "a monster" or ill-tempered" during trial.  In this regard, he lists many charitable events and accolades that allegedly evidence his good standing in the community, including mission trips in Brazil with a "Pastor Wilson," and his being a commissioner in Central City, Colorado, on the Historical Preservation Committee (Br. 21–22).  These arguments fail. Petitioner cannot introduce a new basis to rebuild his character on this petition.  To the extent specific instances of threats and boorish behavior were introduced during trial, the Court of Appeal decision adequately addressed and denied this claim.  2019 WL 2082963 at *23–24. Specifically, the decision held three instances of Cappello threatening his ex-girlfriend, Dings, and Dings' girlfriend, were not relevant, but nevertheless harmless given the other evidence at trial.  A state court's factual findings generally are entitled to a presumption of correctness under 28 USC § 2254(d).  *See Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994).  This finding and holding was not objectively unreasonable.  Thus, this claim is denied.

Finally, petitioner maintains it was improper to introduce the birth certificate and photo identification of his daughter and his other girlfriend, both residing in Brazil.  He appears to argue this evidence served no other legitimate purpose than to display the significant age-gap between him and his Brazilian girlfriend and to introduce a bias to the jurors.  He further elaborates he "did not have relations" with his Brazilian girlfriend and simply supported her and his daughter due to his charitable and religious beliefs (Br. 18–19).  Petitioner raised this argument for the first time in his petition to the California Supreme Court and it was summarily denied.  It can easily be disposed of here, too.  Evidence came out at trial that petitioner had significant ties to Brazil: he made calls to Brazil, had a Brazilian national card of residence, and his child and child's mother were in Brazil.  He told numerous individuals that he would go there often (26 RT 4492; 27 RT 4670).  When he was apprehended, he had a Brazilian passport and other materials tending to show he was on his way to an out-of-country trip.  Clearly, this evidence was relevant and probative to establish his connections to Brazil and the fact that he intended to flee there after committing the crime.  There was no due process violation in admitting this evidence.

**5.   ALLEGED ERROR IN PRECLUSION OF DEFENSE WITNESS DR. RANDALL SMITH.**

In ground five, petitioner argues his right to present a complete defense under the Sixth and Fourteenth Amendments was violated when the trial court precluded his defense expert, Dr. Randall Smith, from testifying.  Dr. Smith intended to provide opinion that, based on a series of tests conducted, petitioner "lacked a propensity for violence."  Dr. Smith was not permitted to so testify, however, because defense counsel did not produce the underlying tests or report in violation of state evidentiary rules and the court's prior orders (Br. 24–29).  Respondent counters that the trial court's decision is not a ground for habeas relief because the California Court of Appeal opinion addressed this claim on the merits and its reasoning was not counter to any clearly established Supreme Court precedent.

An accused has the fundamental right to present witnesses in his own defense.  This right stems both from the due process clause of the Fourteenth Amendment, and the compulsory process clause of the Sixth Amendment.  Defendants do not have an unfettered right to testimony that is inadmissible under the rules of evidence.  *See Taylor v. Illinois*, 484 U.S. 400, 409–10 (1988).  In this regard, the Supreme Court has held "state and federal rule makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  These rules "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve."  *United States v. Scheffer*, 532 U.S. 303, 308 (1998) (cleaned up).

Here, the trial court found defense counsel willfully hid the raw data of defendant's test results until the eleventh hour — after the prosecution had already rested its case — to gain a tactical advantage in violation of California Penal Code Section 1054.3.  The appeal decision reviewed the trial judge's ruling and found no error.  Relying on various circuit court decisions, petitioner argues this evidentiary ruling was arbitrary, as generally, "tardiness is not a proper basis for exclusion of expert testimony" and his constitutional rights outweigh whatever interest was served by the exclusion (Br. 26–27).  The decisions petitioner cites are not sufficient to establish that the California Court of Appeal decision was objectively unreasonable.  "The only definitive source of clearly established federal law under AEDPA is

16

the holdings of the Supreme Court as of the time of the state court decision. While circuit law may be 'persuasive authority' . . . only the Supreme Court's holdings are binding on the state courts and only those holdings need to be reasonably applied." *Moses v. Payne*, 555 F.3d 742, 759 (9th Cir. 2009). Petitioner provides no Supreme Court decision tending to show the state court arbitrarily applied binding precedent. To the contrary, as respondent points out, the relevant Supreme Court cases "do not squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence" nor do they "clearly establish a controlling legal standard." *Id*. at 758. Thus, no violation of clearly established Supreme Court precedent occurred. This order adds that tardiness in violation of a court deadline is indeed a reasonable basis to exclude expert testimony.

### 6. ALLEGED *BRADY* VIOLATION REGARDING DEALS MADE WITH COOPERATING WITNESSES.

In ground nine, petitioner alleges the prosecution violated his right to a fair trial by "failing to disclose or otherwise misrepresenting the plea deals given to Francis and Odin Dwyer for their testimony against [him]" and by hiding additional "favors and benefits" received by Dings for his cooperation (Br. 41). Specifically, petitioner states the jury was not told that the Dwyers' plea deals were "at 50% time — 'half time,' [*i.e*.,] half the years sentenced" and failure to do so amounted to prosecutorial misconduct. Petitioner further alleges Dings lied that he "received nothing to testify for the prosecution," when in reality he received immunity and "his federal sentence was reduced for his cooperation" (Br. 41–42). Respondent counters these claims are factually untrue and/or speculative, and, in any case, *Brady* requires disclosure to the accused, not the jury. Petitioner makes no claim that his attorney did not know of these alleged benefits, the argument goes, nor can this be inferred from the record.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), suppression by the prosecution of evidence favorable to an accused violates due process. The Supreme Court has made clear that the duty applies even when there is no request by the accused and impeachment evidence is

also encompassed.  For a *Brady* claim to succeed, petitioner must show: (1) that the evidence at issue is favorable to him, either because it is exculpatory or impeaching, (2) that it was suppressed by the prosecution, and (3) that it was material, *i.e.*, prejudice ensued.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Petitioner here fails to show any evidence was suppressed at all.  For one, it came out during trial in the presence of the jury that Odin Dwyer would receive a half-time reduction on his otherwise 20-year sentence.  The prosecution specifically asked Odin (30 RT 5243):

> Q:  So that means on a 20-year-four-month sentence, would you receive ten years and two months of actual prison?
>
> A:  That's what I would assume, yes.

Similarly, Dings did disclose that he was testifying pursuant to an immunity agreement during trial (28 RT 4920):

> Q:  I'm now showing you what's been marked People's 770 for identification.  Would you take a look at that and let me know if you recognize it?
>
> A:  Yeah.  This is my immunity agreement with the State of California.  I'm held to tell the truth but nothing can be used against me.
>
> Q:  And you reviewed that document and signed and initialed it?
>
> A:  I'm familiar with it, yes.

Thus, it is factually untrue that these points were never disclosed or revealed.  Petitioner cites nothing to support the claim that Francis Dwyer similarly received a half-time reduction of which his trial lawyer was unaware, or that Dings received additional "favors or benefits."  Rather, he states the "claims are supported [by] on the record and off record evidence, and not in petitioner's possession at this time to refer to," due to various procedural failings by staff.  Such speculative assertions cannot satisfy petitioner's burden to show evidence was suppressed in violation of *Brady*.  This claim is **DENIED**.

### 7. ALLEGED PRESENTATION OF FALSE BLOOD EVIDENCE.

In ground ten, petitioner alleges the prosecution presented deliberately false evidence in violation of *Napue v. People of Illinois*, 360 U.S. 264 (1959), when it discussed a presumptive bloodstain found on his pants in front of the jury.  Specifically, petitioner complains that despite test results showing his pants were "clear of any human blood," the prosecution incorrectly argued the stain was of human origin, further implicating him as the shooter (Br. 48–49).  Petitioner likens his case to *Miller v. Pate*, 386 U.S. 1 (1967), where, during the rape and murder prosecution of an eight-year-old, the state argued reddish-brown stains on a defendant's shorts were bloodstains.  In reality — as revealed after the defendant's own post-trial testing — the stains in question were just paint.  On habeas review, the Supreme Court found "[a] pair of paint-stained shorts . . . was virtually valueless as evidence against the petitioner [and] [t]he prosecution deliberately misrepresented the truth." *Id*. at 6.  The stained shorts having "clearly played a vital part" in that petitioner's case, the Supreme Court reversed the denial of habeas relief and held "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." *Id*. at 7.

Respondent counters that petitioner misstates the facts here, and no misrepresentation anywhere near *Pate* was made to the jury.  Rather, the state's Senior Criminalist, Josh Sehhat, testified correctly that a stain found on petitioner's pants was a presumptively positive bloodstain, but he did not obtain any results from human DNA testing.  Such a result could have been due to three possibilities: (1) the sample was not large enough, (2) the stain was not human blood, or (3) the stain was animal blood (Opp. 69).

There was no *Napue* violation here.  Unlike in *Pate*, Criminalist Sehhat affirmatively stated in front of the jury that the presumptive bloodstain was not confirmed, and no human DNA was found in his results.  Defense counsel specifically solicited this testimony again on cross-examination (22 RT 3857):

Q:  Mr. Sehhat, you tested an apparent bloodstain?

A:  The item was received as an apparent bloodstain, yes.

Q:  You found no DNA and no STR results from that stain; is that correct?

A:  That's correct.

Q:  And you did no testing to confirm that it was in fact a bloodstain; correct?

A:  That is correct.

Q:  And you received no confirmatory testing that confirms that the stain that you found no human DNA blood in was a bloodstain; correct?

A:  That is correct.  Yes.

Q:  Thank you, nothing further.

Given this, it is clear the jury was not misled on the reliability of the bloodstain.  The bloodstain also did not "clearly play a vital part" in this case as it did in *Pate*, as it was not relied upon by the state in closing or rebuttal arguments, and it was not repeatedly emphasized throughout trial.  *See Pate*, 386 U.S. at 6.  No habeas relief can be granted on this ground.

### 8.  CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

In ground thirteen, petitioner makes several ineffective assistance of counsel claims. Broadly, each critique falls in three categories: (1) that his lawyer failed on numerous occasions to investigate facts that, if proven, could have successfully rebutted the prosecutions' theories, (2) that his lawyer failed to make objections to harmful evidence or occurrences during trial, and (3) that his lawyer did not involve him sufficiently in the decision-making and legal process.

To prove an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Cappello first raised these claims before the California Supreme Court, which summarily rejected them.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must be met by showing there was no reasonable basis for the court to deny relief."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  Thus, the silent denial must be treated with deferential review here.  This means "the pivotal question is whether the state court's application of the *Strickland* standard was

20

unreasonable."  Importantly, "an unreasonable application of federal law is different from an *incorrect* application of federal law.  *Id*. at 101.

### A.      Alleged Instances of Failure to Investigate.

#### *(1)      Dwyers Sharing the Same Jail Cell.*

Petitioner states that trial counsel failed to investigate and present evidence that the Dwyers shared the same jail cell with each other.  He alludes to an "eyewitness" that "could have been presented as a defense witness to present the truth" (Br. 64–65).  Respondent counters that while testimony at trial established the Dwyers were housed in the same housing pod in jail, no evidence exists that they were ever living in the same cell.  Thus, respondent argues, the California Supreme Court could have reasonably rejected this claim as unsupported.

This claim fails.  Petitioner provides no evidence whatsoever to support his assertions that the Dwyers were living in the same jail cell or the existence of an eyewitness who could have so testified.  To the extent that the Dwyers were in close quarters while in custody, petitioner's trial counsel adequately bought this point out on cross-examination.  For example, while crossing Francis, petitioner's counsel established that the Dwyers were together in "E Mod" for two years, that they were often brought to court together and waited in the same holding cell, and that they had 45 minute out-of-cell time everyday together for the past month (27 RT 4781–83).  On this record, the California Supreme Court could have reasonably concluded petitioner's counsel did not fall below professional standards in addressing the theory that the Dwyers had ample opportunity to collude.  Further, the Supreme Court could have reasonably decided not to give weight to any assertions that were unsupported.

#### *(2)      Odin Perjury.*

Petitioner claims his counsel failed to investigate that Odin committed perjury when he testified that petitioner helped him move marijuana into three different storage units, but only two were ever located by police.  He states cell phone tracking technology, if used by his lawyer, could have been "extremely exculpatory evidence" that would have proven petitioner was not with Odin during the crime (Br. 65).

This basis fails.  As respondent points out, petitioner misstates Odin's testimony.  Odin testified that after the crime, he left Cappello's girlfriend's house with the marijuana and stored it (along with the packing machine and enzyme) in a storage unit (29 RT 5129).  Odin never stated Cappello accompanied him to the storage unit.  Similarly, Francis confirmed that the marijuana was stored "by Odin" somewhere, and eventually "Odin moved it to another storage facility" (27 RT 4788–89).  The California Supreme Court could have noticed this inconsistency and reasonably rejected petitioner's claim as based on a misstatement of the record.

  *(3) Rogers Perjury*.

Petitioner argues his lawyer failed to investigate that his ex-girlfriend, Jennifer Rogers, was "incentivized by prosecution in the sum of $13,000" and her testimony that she was "afraid of the Cappello's family" was demonstratively false, as she never stated this before trial, and she continued to have contact with petitioner and his siblings after the fact.  Further, petitioner argues Rogers testified his ring was a Hells Angels Ring when it was not, further evidencing her perjury (Br. 66, 72).

Petitioner offers no affidavit from his counsel or anything else to support a claim of lack of investigation here.  The record suggests just the opposite.  During trial, Rogers stated while the investigation was ongoing, she "would write letters back and forth" with petitioner.  She testified after she broke up with him, she would still interact with his siblings, and his sister-in-law would "call [her] periodically and check on how [she] was doing"  (26 RT 4541).  On cross, petitioner's counsel got Rogers to admit she lied to both law enforcement and the prosecution about the nature of her relationship with Cappello, and he impeached her testimony with a prior interview (26 RT 4555–69).  He also challenged her alleged fear of petitioner, quoting letters written by her stating she loved him (26 RT 4576–78).  Other than petitioner's own insistences otherwise, petitioner offers nothing to show the ring referenced by Rogers was not in fact a Hells Angles ring (27 RT 4674).  On this record, the California Supreme Court could have reasonably rejected petitioner's claim that his counsel performed deficiently under *Strickland*.

1            (4)    *Francis Post-Murder Firearm Sale*.

2        Petitioner argues his counsel failed to investigate Francis' sale of guns and pistols after

3    the crime, which could have been "most critical" because "if one of the guns was a .45 Cal., it

4    could be the murder weapon" (Br. 75).  This critique is based entirely on the speculation that

5    such an investigation would have yielded a positive result for petitioner.  There was an equal

6    risk, as respondent points out, that such investigation would have *ruled out* the possibility that

7    the murder weapon was sold by Francis.  This would have been even more harmful to

8    petitioner's case (Opp. 82).  Petitioner does not meaningfully dispute that there was a tactical

9    advantage in leaving this ambiguity in place and simply raising the suspicion to the jury as his

10   lawyer did, thereby avoiding any backfire risk.  The California Supreme Court could have

11   reasonably concurred that this strategic decision was not deficient.

12           (5)    *Petitioner's Medical Records*.

13       Petitioner states his medical records would have shown he had vertigo and "excessive

14   blinking," which would have been exculpatory because he could not have had the above

15   average skill necessary to fatally shoot each victim (Br. 68).  He claims everyone who knew

16   him knew about his condition and his counsel failed to investigate this disability.  Petitioner

17   does not provide any of the alleged medical records with his petition, nor does he provide a

18   declaration from a medical expert stating his vertigo and excessive blinking would have

19   prevented him from being the shooter.  He further does not claim he alerted his counsel to this

20   alleged condition during trial, but simply that "both defense counsel and prosecution knew."

21   This claim is insufficient.  As respondent points out, the Supreme Court has already recognized

22   "the absence of evidence cannot overcome the strong presumption that counsel's conduct fell

23   within the wide range of reasonable professional assistance."  *Burt v. Titlow*, 571 U.S. 12, 18

24   (2013).  The California Supreme Court could have reasonably rejected petitioner's invitation to

25   premise a *Strickland* violation on unsupported allegations.

26           (6)    *Petitioner's Financial Status as Compared to Dwyers*.

27       Petitioner argues his trial attorney was ineffective by failing to do a financial

28   investigation of him, which "would have shown that [he] had good credit scores in the 700+,

United States District Court
Northern District of California

United States District Court
Northern District of California

no late payments shown on any financial reporting record" and overall financial strength. Conversely, petitioner argues, an investigation of the Dwyers would have shown they were financially struggling and had more of a motive to steal the marijuana (Br. 74).

This claim fails for several reasons. As with many of the other claims alleged, petitioner provides no evidentiary support that the Dwyers' finances were in fact more dire than his own, or that his attorney failed to investigate it. Indeed, he himself could have told his trial counsel of his personal financial status without the need of an investigation. Apart from that, even if his counsel did forgo an investigation of his or the Dwyers' finances, there is no proof this was a defective strategy. As respondent points out, the trial evidence already clearly established the Dwyers were poor. Petitioner's counsel used this information to argue motive during closing arguments, stating "[s]o why would Mark Cappello, with an opportunity to continue to work with Todd Klarkowski . . . destroy all of that with an unbelievable act of violence? Why? . . . Conversely, Odin Dwyer, who Charles Wyatt says owed money to a drug dealer, and Francis Dwyer, they were living in a lower socioeconomic standard by a pretty good margin" (35 RT 6169). On this record, the California Supreme Court could have reasonably concluded petitioner's counsel did not act deficiently by failing to address the motive of the Dwyers' financial gain.

*(7) Other unsupported instances*

Petitioner seems to assert that there was a failure by his trial counsel to investigate an instance where an unknown person left a written note on his family's property which stated Odin would frame petitioner for the murders. He further critiques his lawyer's alleged failure to investigate Wyatt's testimony that Odin admitted while in custody that petitioner was not present at the scene of the crime (Br. 63, 74). Petitioner does not provide a copy of the note referenced or any other evidence tending to show its existence. There is no information as to the author of the note, nor is there any declaration that this person would have testified if asked to do so by Attorney Stogner. Further, as explained elsewhere, (Section 10), the issue of Charles Wyatt's testimony was adequately argued. With no evidence to support these allegations, the California Supreme Court was not objectively unreasonable in denying them.

United States District Court
Northern District of California

**B.     Alleged Instances of Failure to Object.**

*(1)     Trial Judge's First-hand Knowledge of Charles Wyatt.*

Petitioner alleges it was ineffective assistance of counsel for his lawyer to fail to move for the recusal of the trial judge in this case, Judge Robert LaForge.  As an ex-prosecutor, Judge LaForge had once used defense witness Charles Wyatt as a witness in a different criminal case he was prosecuting.  Thus, the argument goes, the judge "had an objective appearance of bias."  Petitioner also asserts the judge "could have testified" as to the credibility of Wyatt and rebutted the prosecution's attack on his credibility (Br. 72–73).  As stated elsewhere in this order (Section 10), this argument fails.  Under no circumstance would the trial judge have been permitted to serve as a bolstering witness for the defense.  Petitioner provides no declaration or evidence that his trial counsel did not in fact know about the previous criminal case and consider a recusal motion.  His lawyer could have considered bringing the motion, but reasonably decided against it after weighing all the circumstances and concluding it would be meritless.  This ground, which mirrors claim twelve of petitioner's petition, does not adequately allege ineffective assistance or any other due process violation.  The California Supreme Court could have reasonably considered and rejected it.  This order also notes that this claim was previously determined to be procedurally defaulted, and the default was unexcused, so no habeas review is available (Dkt. No. 30).

*(2)     Evidence of Petitioner's Brazilian Girlfriend and Child.*

Petitioner argues his lawyer was ineffective for failing to object to the introduction of evidence regarding his Brazilian girlfriend and daughter as more prejudicial than probative.  As explained elsewhere in this order, (Ground Four), this evidence was relevant to show petitioner's connections to Brazil and that he was likely in the process of fleeing there after the crime.  His trial counsel could have reasonably concluded challenging this evidence would have been meritless and thus forwent an objection.

*(3)     The Two-foot Photo of Petitioner in Jail Clothing.*

Petitioner argues it was error for his lawyer not to object to a "two-foot photo" of him in jail clothing that was allegedly introduced at trial.  He does not cite to the record regarding this

photo, provide a copy of it, nor can respondent "find any indication in the record that the prosecutor admitted a two-foot photo of petitioner into evidence" (Opp. 84).  Given the lack of support that this photo admission even took place, the California Supreme Court could have reasonably declined to find error.

### C.     Alleged Instances of Failure to Involve Petitioner in Decision-Making.

Petitioner argues his lawyer during trial did not give him "any discovery while awaiting trial" and he remained at the disadvantage of not knowing what the prosecution was going to say or the evidence that would be used.  He also claims that counsel "never went over any pretrial statement or reports" and overall did not discuss the case with him sufficiently (Br. 72, 75).  Once again, these allegations are not supported by declarations or any other evidence tending to show petitioner's complaints are true.  "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  The California Supreme Court could have reasonably concluded these allegations were insufficient to establish deficient representation occurred.

### 9.   ALLEGED BREACH OF ATTORNEY-CLIENT PRIVILEGE.

In ground fifteen, petitioner alleges his right to a fair trial and right to counsel were violated when the prosecutor, Odin, Odin's lawyer, and Detective Cutting listened in on a private conversation Cappello had with his then-counsel.  He states he did not find out about this "ease-dropping" until twenty-two months later, and this incident enabled the Dwyers to "plot what Odin [had] just seen and heard with each other" to his detriment (Br. 85).  Petitioner proceeds to give numerous examples of how Odin might have changed his story to coordinate with Francis.  This claim was raised for the first time in a habeas petition before the California Supreme Court, and it was summarily denied.

Respondent provided a declaration from District Attorney Traci Carrillo, an incident report authored by Detective Cutting, and transcripts of pre-trial hearings to shed light on this issue (3CT 507–10; 512–15; 516–533; 3 RT 352–356).  These sources show before the commencement of trial, petitioner and his then-attorney agreed to give a voluntary statement to law enforcement.  The statement was recorded both with a video/audio recorder and a

secondary audio-only recorder in the Sheriff's Office.  Unbeknownst to petitioner at that time, Odin, his lawyer, and the prosecutor were observing his voluntary statement to the police in a separate viewing room.  The agreed upon procedure between petitioner's counsel and Detective Cutting was that all recording would be stopped prior to any privileged conversations taking place (3CT 512).

During a break, when petitioner's voluntary statement had stopped and petitioner was conferring with his lawyer, Detective Cutting stated he inadvertently failed to pause the "video/audio" recorder when he left the room, although he did successfully pause the "audio-only" recorder (3CT 513).  As a result, a portion of petitioner's conversation with his lawyer was recorded.  The monitor in the viewing room (where the others were listening), however, had been turned "off completely," so as not to reveal any live conversations (3CT 512).

When Detective Cutting realized he may have inadvertently recorded a conversation between petitioner and his lawyer, the recording DVD was immediately sealed.  Petitioner's counsel was provided the CD for review (3CT 497–500; 513).

This matter was ultimately handled by the trial judge in various pre-trial proceedings, including a review of the footage *in camera*, a hearing on whether the recording was inadvertent, and briefing on the legality of Detective Cutting's failure to disclose to petitioner and his attorney that Odin and others would be viewing his voluntary statement.  After this, the trial court held "th[e] conversation, in my opinion, is not about anything substantive.  But I am going to rule that nothing in that conversation that is recorded can be used for any purpose, whatsoever, against Mr. Cappello" (3RT 352).

Here, petitioner does not clearly state how this pre-trial incident — which was fully explored and addressed by the trial judge —  violated his federal rights to a fair trial or his right to counsel.  He argues this incident resulted in Odin and Francis Dwyer colluding with the prosecutor and detective to coordinate their stories and to pin the crime on him but provides no evidence that such collusion took place.  Further, petitioner does not tie together how the substance of the conversation, if leaked, could have resulted in any advantage to the other side or a federal violation.  In essence, he does not challenge the trial court's holding that the

United States District Court
Northern District of California

conversation was insignificant.  This claim, thus, could have properly been denied by the California Supreme Court as insufficiently alleged.

### 10. ALLEGED ERROR REGARDING DEFENSE WITNESS CHARLES WYATT.

Grounds six, seven, eight, and eleven, all refer to the same allegation of a due process violation and prosecutorial misconduct regarding defense witness Charles Wyatt.  Specifically, petitioner contends his right to a fair trial was violated because the trial court did not allow the jury to hear evidence that Wyatt had testified in the past as a prosecution witness in a different criminal trial, evidence, the argument goes, which would have proven his reliability as a witness in this case.  The California Court of Appeal addressed this general argument in six pages of its appellate opinion.  *See* 2019 WL 2082963 at *29–34.

Relatedly, petitioner has moved for leave to file a supplemental petition based on Wyatt having previously testified in another, previously unknown case.  Specifically, the supplemental petition argues the prosecution committed a *Brady* violation during trial by failing to disclose that "in 2003, defense witness Charles Wyatt was a prosecution witness in a murder case where the trial judge in Cappello's case, Robert M. LaForge, was the lead prosecutor, and that, in exchange for his cooperation, Wyatt received significant benefits, including rent payments and money between $400 and $600 for one year" (Supp. Br. 2–3).  Petitioner through counsel admits this claim is unexhausted, but argues the information was only recently discovered and thus merits a stay and abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005).  Respondent opposes, stating petitioner's request is untimely, time barred, and in any case does not state a colorable claim.

Before addressing these arguments, it is worthwhile to first summarize the facts as they were developed during trial relating to defense witness Wyatt, the arguments made by counsel, and the analysis of the Court of Appeal:

### A.    The Facts Developed at Trial.

Witness Charles Wyatt met Odin in February 2013 when they were both housed in Sonoma County Jail.  They were in neighboring cells and would speak to each other through a vent.  During one such conversation, Wyatt testified, Odin confessed that he was the one who

28

"whacked" the three victims (33 RT 5848).  When asked to elaborate on direct examination,

Wyatt explained that at first, upon meeting Odin in custody, they started out with just normal

"jailhouse conversation" such as "what you were here for" and "court dates."  Odin seemed like

he did not know a lot about the court system, and Wyatt would "guide him through about what

to expect in court" (33 RT 5848).  Wyatt testified Odin eventually admitted "[Odin] and his dad

planned to commit the robbery" and that "Mr. Cappello did not know."  Odin allegedly told

Wyatt that he did the crime because he owed a drug dealer in Colorado some money, and

petitioner was back at the hotel when the murders were committed.  Wyatt said Odin did not

specify whether or not his father was with him during the murders, but Wyatt assumed Francis

was present given Odin's use of the word "we" (33 RT 5849–5851).

Upon learning of this confession, Wyatt wrote a letter to the district attorney's office.  A

redacted version of Wyatt's letter was admitted into evidence.  It read in relevant part (as

provided by the Court of Appeal decision):

> My name is Charles Martin Wyatt.  I am presently housed at the
> Sonoma County Main Adult Detention Facility.  *I have testified for
> the district attorney's office in 2008* [italicized redacted].  I am
> willing [to] cooperate and testify to what Mr. Dwyer has told me,
> without any promises, considerations or other documents.  Please
> feel free to contact me with any questions or if I can be of further
> service.

The district attorney's office never responded to Wyatt's letter.  Later, in January 2016, Wyatt

wrote to petitioner's trial counsel, Attorney Joseph Stogner.  Wyatt asked Attorney Stogner for

help with a habeas corpus matter and told him that he had relevant information on petitioner's

case.  By the time Wyatt testified in trial for petitioner, however, he stated he was not testifying

for counsel's legal assistance but only "to offer the truth . . . that will help the victims' families"

(33 RT 5857).

### B.  Arguments Made During Trial and Evidentiary Ruling.

On direct examination, in addition to the above testimony, defense counsel brought out

that Wyatt had been convicted of felony possession for the sale of marijuana, felony rape of an

unconscious person, and felony infliction of traumatic condition on a cohabitant or spouse.

Defense counsel did not ask on direct whether Wyatt had cooperated with the district attorney in the past.

On cross-examination, the prosecutor discussed the other charges Wyatt had been in custody for at the time of the alleged jailhouse conversations, namely, felony domestic violence, felony assault with great bodily injury, "a bunch of misdemeanors" (including five restraining orders and a DUI), and a prior strike. Bail had been set at $1.5 million. The prosecutor did not ask Wyatt about the letter he wrote to the district attorney's office.

When asked whether defense counsel wanted to do a redirect, Attorney Stogner requested a sidebar. Outside of the presence of the jury, he argued that the convictions and bail information that the prosecution had solicited on cross-examination attacked the defendant's credibility and thus "opened the door for [defense counsel] to ask [Wyatt] about the fact that he's testified for the prosecution" in the past (33 RT 5865). To do so, defendant wanted to admit the letter (excerpted above) in its entirety, as well as to call a "Detective Dempsey" to verify both that the district attorney had received Wyatt's letter and that Wyatt had, in fact, testified as a prosecution witness in a 2008 case. The prosecution objected, arguing that its cross-examination had not opened the door to this evidence because its questions had been limited to crimes Wyatt had been charged with at the time of the alleged jailhouse statements.

During the sidebar, the judge asked defense counsel why he had not simply asked Wyatt on direct if he had ever testified for the prosecution. Attorney Stogner replied, "Well, I thought that I wanted to wait for the door to open because I wanted to ensure that there was an attack on credibility" (33 RT 5866). Given that it was 4:30 PM on a Friday, the trial judge declined to re-open Wyatt's direct, and stated further argument would be heard on the issue the following Monday.

After additional argument the following Monday, the judge found no attack on Wyatt's credibility had occurred during the prosecution's cross-examination, and thus did not allow defense counsel to re-direct. Regarding Wyatt's 2013 letter, the parties stipulated that it was in fact received by the district attorney's office in April 2013, and the judge redacted the portion of the letter where Wyatt alluded to having testified for the prosecution in the past. In so holding,

United States District Court
Northern District of California

the judge reasoned the following (33 RT 5890):

> As far at the letter itself that Mr. Stogner is seeking to introduce, I do believe that the People's cross-examination, even though it was limited to the cases he had at the time, make this letter relevant.  However, I am redacting the, "I have testified for the district attorney's office in 2008."  I think it was a tactical decision based on the evidence in this case for Mr. Stogner not to bring that up on direct examination.
>
> I just want to be clear for the record, I even took a break before Mr. Wyatt testified due to the expectation that Mr. Stogner would be asking questions about prior testimony for the district attorney's office and for Mr. Stogner to discuss with Mr. Wyatt before his direct examination since it was my impression that would be — and also we've litigated that issue since the beginning of the case.  And I must say I was surprised at the end of Mr. Stogner's direct examination that it wasn't even mentioned.  And I believe clearly based on what I had seen, that was a tactical decision by Mr. Stogner in hopes of Mr. Brady cross-examining in a different way than he did.  And I'm just going to leave it at that.

Thus, the fact that Wyatt had previously been a witness for the district attorney's office in a different case was never revealed to the jury.  In closing arguments, when the defense tried to bolster Wyatt's credibility using Wyatt's claim in his letter that he sought no "promises, considerations or other documents," the prosecution argued the following in its rebuttal closing argument (35 RT 6188–6190):

> Let's talk about Charles Wyatt for a minute.  I made some points that I want to go over with you.  He came up with a lie about what happened.  He shopped that lie to the DA's office.  The DA's office didn't bite.  The DA's office made that known to the defense, which is why you know about it because the defense was advised about it.  So nobody's hiding anything with regard to Charles Wyatt.
>
> The DA did not work with Charles Wyatt in this case at all.  Why?  Think about that.  Let's shine the light under that bed, the bed of Charles Wyatt.  First of all, he is a bit of a monster, honestly, if you think about it.  Rape of an unconscious person.  Repeated domestic violence.  Strike prior.  Bail over a million dollars.  He's a career criminal.  A very dangerous guy.  And he gives advice to people in jail on how to work the Court or work the system . . .  So he gets it.  He's been through the Court process his entire life, and he's serving a big chunk of jail time right now for what he's done.  So he's a sophisticated criminal.
>
> So he writes a letter to the DA when he's got I don't remember how many charges pending.  A lot.  Is he one of those unbiased citizen informants that Mr. Stogner talked to you about with no agenda of

United States District Court
Northern District of California

his own out of the goodness of his heart?  . . . [N]o, of course not.
And of course, he is looking for a quid pro quo, a this for that . . .

 [B]ecause he's a career criminal, because he's sophisticated, he
knows how the system works.  He knows in the DA's office a guy
like him is going to say, "No, thank you.  That's crazy.  We're not
interested in doing that."

### C.  Arguments Made on Appeal and the Appeal Decision.

On appeal, petitioner argued that it was error for the trial court to exclude evidence that Wyatt previously testified for the prosecution, arguing that such testimony was relevant to show his reliability.  Petitioner also argued the prosecutor's statements during rebuttal closing argument amounted to prosecutorial misconduct, because the prosecution knew that Wyatt was, in fact, a reliable informant, as that same office had used him in a prior case before (unbeknownst to the jury).  It was unfair and false testimony, the argument went, to discredit Wyatt as a shady witness when the very same office had deemed him good enough to use in the past.

The California Court of Appeal rejected these arguments.  Regarding the exclusion of evidence that Wyatt previously testified for the prosecution, the appeal decision reasoned:

Cappello claims the trial court erred in excluding "evidence
that Wyatt was a reliable confidential informant."  This argument
fails because defense counsel never attempted to present evidence
that Wyatt was a "reliable confidential informant."

Cappello relies on *Harris, supra,* 47 Cal.3d at pages 1080–
1082, in which our high court held evidence of a witness's past
reliability as an informant was admissible to support that witness's
credibility.  In *Harris,* a sheriff's sergeant testified that a trial witness
had provided reliable information in the past.  (*Id.* at p. 1080.)  The
officer's testimony was, in effect, character evidence for honesty —
"evidence of specific instances of the informant's past reliability as
relevant to the informant's [current] credibility." (*People v. Lankford*
(1989) 210 Cal.App.3d 227, 239.)

Cappello argues, "Evidence that Wyatt was a reliable
confidential informant was relevant to his credibility."  But defense
counsel in this case did not offer evidence that Wyatt was a "reliable
confidential informant" or that he had provided law enforcement
reliable information in the past.  He sought to establish only that
Wyatt was a prosecution witness in a criminal case in 2008.
Cappello cites no authority for the proposition that merely testifying
for the prosecution in the past is relevant to current credibility, and
we are not aware of any. Evidence that Wyatt testified in a criminal

United States District Court
Northern District of California

trial would not establish that he testified truthfully at that trial and, therefore, would not be relevant to his credibility under *Harris*. Accordingly, the trial court did not abuse its discretion in ruling defense counsel could not ask about the prior testimony on redirect examination.  Likewise, the trial court did not abuse its discretion in denying Cappello's request to reopen Wyatt's testimony (citations omitted).

Further, regarding the alleged prosecutorial misconduct done by the prosecution's rebuttal closing argument, the opinion reasoned in relevant part:

Cappello first claims the prosecutor improperly told the jury that "the DA would not work with someone like Wyatt."  We reject this claim because the prosecutor did not make this assertion. Instead, the prosecutor accurately told the jury that the district attorney's office did not work with Wyatt "in this case."   The prosecutor then reminded the jury that Wyatt had been convicted of domestic violence and rape of an unconscious person, and the jury was entitled to infer that these felony convictions "affected the veracity and persuasive value of" Wyatt's testimony (citations omitted). That the prosecutor called Wyatt "a bit of a monster" and a "very dangerous guy" based on these convictions does not establish misconduct. (*See People v. Shazier, supra*, at p. 146 ["Harsh and colorful attacks on the credibility of opposing witnesses are permissible if fairly based on the evidence."].)

Cappello next argues that the prosecutor implied he "simply did not believe" Wyatt and "raised the possibility the jury would assume the prosecutor had undisclosed knowledge regarding Wyatt's information."  He argues that the prosecutor, in effect, "vouched" for the lack of credibility of Wyatt.

[ . . . ]

Here, the prosecutor did not improperly "vouch" for Wyatt's dishonesty. He relied on Wyatt's felony convictions to impeach his credibility.  He suggested that Wyatt's motive for contacting the district attorney's office was to obtain a more favorable result in his own pending criminal case, which was a reasonable inference from the evidence. He argued that Odin's version of events as told to law enforcement was corroborated by physical evidence, but Wyatt's version of events (that Odin was the killer) was not so corroborated. (citation omitted).   But the prosecutor did not state that the district attorney's office had never worked with Wyatt or that it would never work with Wyatt.  Nor did he state that he personally did not believe Wyatt.

Cappello complains that the prosecutor's comments shown in italics above were problematic because he knew Cappello had evidence that he was precluded from presenting from which the jury could infer that Wyatt was credible. This claim fails because evidence that Wyatt testified for the prosecution in a criminal trial in 2008 was not relevant to Wyatt's credibility.

1    Thus, petitioner's challenges regarding the fact that Wyatt had testified

2    previously for the prosecution were denied on appeal.

3    **D.  Claims Now Raised in Petitioner's *Pro Se* Petition**.

4    With the benefit of the above background, petitioner's grounds six, seven, eight, and

5    eleven, which essentially repeat the same grounds as rejected in state court, will be denied here

6    too, as the state court's holding was not objectively unreasonable.

7    Petitioner asserts various iterations of the same argument — that his rights to a fair trial

8    and to present a complete defense were violated by his being precluded from presenting

9    "exculpatory evidence" that witness Charles Wyatt was once a witness for the prosecution in a

10   past case.  Had the jury known this information, the argument goes, it "would have established

11   that [Wyatt] was a reliable confidential informant, and a credible witness for the state" (Br. 29,

12   35).  In a slightly new spin on an old issue, rather than categorizing the problem as an

13   evidentiary error by the trial court, petitioner now claims it was a *Brady* violation by the

14   prosecution.

15   This argument fails.  It is abundantly clear that all parties were aware that Wyatt had

16   testified for the prosecution in 2008 by virtue of his letter.  That fact was not suppressed but well

17   known to counsel and petitioner.  There having been no suppression, there was no *Brady*

18   violation.  It is evident from the record that Attorney Stogner knew about the prior testimony

19   and strategically elected not to question Wyatt about it during his direct examination.  The trial

20   judge found, pursuant to state evidentiary rules, that the prosecution did not open the door to the

21   evidence.  This evidentiary ruling was not objectively unreasonable.

22   Additionally, the Court of Appeal was not objectively unreasonable in its holding that

23   there was no prosecutorial misconduct, as the fact that Wyatt had  testified previously as a state

24   witness did not necessarily speak to his reliability in the current case.  Indeed, very different

25   circumstances could have existed when Wyatt testified for the prosecution back in 2008.

26   Wyatt's testimony back then could have been corroborated by other evidence, he could have had

27   less serious pending charges at the time, and other factors could have been present tending to

28   support his truthfulness, just to name a few.  A judge could have reasonably ruled this evidence

United States District Court
Northern District of California

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

should be excluded, as it would necessitate a re-examination of the 2008 case and engagement in a comparing match to establish the Wyatt's veracity.  The California Court of Appeal decision accurately reasoned the prosecution did not state it *never* used Wyatt as a witness, simply that it would not do so *in this case*.  2019 WL 2082963 at *33.  This ruling was not objectively unreasonable, and no fundamental error occurred meriting habeas relief.  Accordingly, these claims are **DENIED**.

### E.  Claims Raised by Petitioner's Supplemental Petition.

In the recent supplemental petition, petitioner argues the prosecution withheld, in violation of *Brady*, the fact that in 2003, Wyatt had been a prosecution witness in a murder case where the trial judge had been the lead prosecutor.  Petitioner admits that this claim is unexhausted (Supp. Br. 2–3).  We will not, however, delay this case any further to allow petitioner to go back to state court for exhaustion for the following reasons.

As explained in detail elsewhere, (Procedural Background), the Court gave petitioner numerous extensions on a deadline by which to file a traverse.  When counsel joined the case, respondent's opposition had already been filed and three extensions totaling 117 days were already granted to petitioner proceeding *pro se*.  Petitioner's new counsel was given an additional sixty days from the original deadline, as requested, to file a traverse.  As the sixty days was about to run out, he asked for a 120-day extension.  Had counsel's request been granted, the law clerk working on the case would have been long gone.  Given this, the Court gave the longest extension consistent with the law clerk being able to finish the case: 63 days until October 2, 2023.

Still, on the eve of the new deadline, instead of filing a traverse, petitioner requested another 57-day extension.  By this time, petitioner had a cumulative total of 270 days to file a traverse (140 days when he was *pro se*, and 123 days with counsel).  Another extension simply was not possible, and petitioner was directed to file a traverse within four days or "the petition will be decided on the papers already submitted" (Dkt. No. 65).  When this date arrived, counsel still filed no traverse, but instead, filed a supplemental petition requesting a *Rhines* stay.

There is no absolute right to return to state court to exhaust unraised claims.  In *Rhines v. Weber,* 544 U.S. 269, 277 (2005), the Supreme Court stated:

> [A] stay and abeyance should be available only in limited circumstances.  Because granting a stay effectively excuses a petitioner's failure to present his claims first to state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.  Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay where his unexhausted claims are plainly meritless.

Here, petitioner does not establish good cause for his failure to exhaust his new claim.  Despite habeas counsel's assertion that he "did not know about" the 2003 case in which Wyatt testified as a prosecution witness, and such information should have been disclosed under *Brady,* (Br. 4), this cannot carry the day for good cause.

For one, no declaration from trial counsel Attorney Stogner is provided which supports the claim that petitioner was unaware of the 2003 case at the time of trial.  This is important because the previous 2008 case in which Wyatt was a prosecution witness — which led habeas counsel to discover the unknown 2003 case — was known to petitioner's trial counsel.  The record shows Attorney Stogner discussed the 2008 case during trial in relation to Wyatt's letter to the district attorney's office.  The revelation of a second, earlier case could have easily been found by due diligence or, by simply asking Wyatt himself.

Further, there is no Supreme Court decision holding that under *Brady* and its progeny, the prosecution must disclose evidence that could be used to bolster a witness called by the defense.  Again, the defense witness himself was in a position to tell the defense lawyer such bolstering information.  When our court of appeals considered this very issue in a past habeas case, it affirmed denial of the petition reasoning "[n]o Supreme Court precedent clearly establishes that possible impeachment evidence of a defense witness is favorable to the accused, thereby mandating disclosure under *Brady*."  *Malone v. Felker*, 453 F. App'x 754 (9th Cir. 2011).  Thus, it is clear the proposed ground would be "plainly meritless" in any case.  The interests of justice militate in favor of bringing this long case to an end.  The request for a stay is **DENIED**.

36

**11. CUMULATIVE ERROR**.

There being no error found, petitioner's request for relief based on cumulative error is DENIED.

## CONCLUSION

For the reasons provided herein, petitioner Cappello's writ for habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated:  November 15, 2023.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California